## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION AT LAFAYETTE

DAVID BRETTLER,                        )
                                       )
    Plaintiff,                      )
                                       )
v.                                     )    CAUSE NO.: 4:05-CV-6-PRC
                                       )
PURDUE UNIVERSITY,                     )
                                       )
    Defendant.                      )

### OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment [DE 12], filed by Purdue University[1] on June 22, 2005, and Plaintiff's Motion for Summary Judgment [DE 17], filed by David Brettler on August 10, 2005.  For the following reasons, the Court grants Purdue University's Motion for Summary Judgment and denies Brettler's Motion for Summary Judgment.

### PROCEDURAL BACKGROUND

On January 20, 2005, Brettler filed an Employment Discrimination Complaint alleging that Purdue University violated his "right to reasonable accommodation," pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII") and pursuant to Titles I and II of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, *et seq*. ("ADA").  Within his Complaint, Brettler demands compensatory damages for "opportunity costs" and punitive damages.

On February 18, 2005, Purdue University filed its Answer.

---

[1]In its Motion for Summary Judgment, Purdue University states that the caption on the Complaint incorrectly identified it as "Purdue University" and that the true Defendant is the entity "The Trustees of Purdue University."

On June 22, 2005, Purdue University filed a Motion for Summary Judgment, as well as a Brief in Support of Motion for Summary Judgment and Statement of Material Facts.  Also on June 22, 2005, Purdue University filed its "Notice in Compliance with *Lewis v. Faulkner* for Defendant's Motion for Summary Judgment."

On July 26, 2005, Brettler filed his Response to Motion for Summary Judgment.  On August 4, 2005, Purdue University filed its Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment.

On August 9, 2005, Brettler filed his Motion for Summary Judgment.  On August 26, 2005, Purdue University filed its Response to Plaintiff's Motion for Summary Judgment.  Brettler did not file a Reply.

The parties consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case.  Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).


**SUMMARY JUDGMENT STANDARD**

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477

2

U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the nonmoving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the nonmoving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the nonmoving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e)

establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the nonmoving party must do more than raise some metaphysical doubt as to the material facts; the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the nonmoving party and draw all legitimate inferences in favor of that party. *NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249-50; *Doe*, 42 F.3d at 443. Specifically in regards to cross motions for summary judgment, "our review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration is made." *Allen v. City of Chi.*, 351 F.3d 306, 311 (7th Cir. 2003).

## FACTUAL BACKGROUND

The following are the facts viewed in the light most favorable to the nonmoving party.[2]  The Trustees of Purdue University is a corporate body created by the Indiana legislature through Indiana Code § 20-12-37-1 *et seq*.  The Trustees of Purdue University operate Purdue University.

On October 9, 2003, Brettler was accepted into the graduate program of the Department of Agricultural Economics ("Department") in Purdue University's School of Agriculture.  Included in Brettler's Admission Letter was an offer to Brettler for a one-quarter time graduate research assistantship in the Department, which was contingent on his maintaining "satisfactory academic performance" and "acceptable progress and work reviews."  Def. Br., Exh. 1-A.  Graduate assistants receive modest remuneration along with generous remission of tuition.  On October 16, 2003, Brettler was sent a letter of admission from Purdue University's Graduate School, which included a "Personal Information Sheet."  Each Personal Information Sheet contains the following clause:

> **Special Services**: Purdue University is committed to meeting its obligations pursuant to Section 504 of the Rehabilitation Act of 1973, as amended, and the Americans with Disabilities Act of 1990, as amended.  If you need auxiliary aids and services

---

[2] Local Rule 56.1(a) requires that a party opposing a motion for summary judgment submit a response that includes a "Statement of Genuine Issues" setting forth all material facts as to which a genuine issue exists and which may be litigated.  Local Rule 56.1(a) further provides that the "Statement of Genuine Issues" and the facts stated therein shall set forth all material facts, with appropriate citations to discovery responses, affidavits, depositions, or other admissible evidence.  In the "Statement of Genuine Issues," the nonmoving party's response is not required "to respond to each and every fact, point by point, [but] it does require that the nonmoving party submit potentially determinative facts and identify factual disputes" that may preclude summary judgment.  *Fox v. Lear Corp.*, 327 F. Supp. 2d 946, 948 (S.D. Ind. 2004).  Failure to include such crucial facts may be detrimental to the non-movant's case because the Court assumes the facts as claimed and supported by admissible evidence submitted by the moving party, unless they are controverted with supporting evidence by the nonmoving party.  *See* L.R. 56.1(b).  Brettler has not provided a Statement of Genuine Issues.  The only evidence submitted by Brettler is his sworn Affidavit.  Accordingly, the Court relies on the admissible material facts in Purdue University's Statement of Material Facts that are not contested by Brettler's Affidavit as well as any supported material facts set forth in Brettler's Affidavit.

because of physical, mental and/or learning disabilities, please contact, as soon as possible, the Coordinator of Adaptive Services, Office of the Dean of Students, Schleman Hall, 765-494-1247 (Voice/TDD).

Def. Br., Exh. 2-B.

Brettler began his academic studies at Purdue University in the spring term of the 2003-2004 academic year. All new graduate assistants in the Department participate in orientation at the beginning of the semester, during which they are advised of the Department's policies and procedures, including those covering graduate assistantships.

Graduate assistantships are dependent upon successful academic performance as a graduate student, as well as satisfactory periodic reviews of the graduate assistant's work. Graduate assistants are expected to enroll in twelve credit hours of work and maintain a grade point average of 3.0 or higher. If the graduate assistant's grade point average falls below 3.0, the student is automatically put on probation and "performance below this level will result in automatic review and possible loss of assistantship." Def. Br., Exh. 1, ¶ 9, Exh. 1-B. Also, "[i]f the Department's periodic review indicates that the assistantship work of the student is unsatisfactory," the assistantship may be "terminated." Def. Br., Exh. 1, ¶ 10, Exh. 1-B. Finally, it is the standard policy for the Department to terminate a graduate assistantship if the student fails to make satisfactory academic progress, as indicated by a minimum 3.0 grade point average.

At the conclusion of the spring semester, Brettler's grade point average was 2.33, and he was enrolled in a total of twelve credit hours, consisting of four three-credit-hour classes. He had received one grade of "D," two grades of "B," and one "Incomplete." The "Incomplete" was received for failing to turn in a required paper. As of the date of Purdue University's Motion for

Summary Judgment, Brettler had not completed the coursework for the class in which he received the "Incomplete" or contacted the instructor, Dr. Binkley, since the end of the Spring 2004 semester.

On May 7, 2004, Brettler's supervisor, Dr. Lovejoy, evaluated Brettler's work and indicated that it was "not acceptable" and noted that Brettler had turned in "no work product."  Def. Br., Exh. 1, ¶ 14, Exh. 1-C.  Dr. Lovejoy commented in the evaluation that Brettler had indicated that he intended to make up the work over the summer, but Dr. Lovejoy saw "little evidence" of any progress.  Def. Br., Exh 1, ¶ 15, Exh. 1-C.  According to Purdue University,  Brettler's assistantship was terminated at the end of the Spring 2004 semester due to his unsatisfactory grade point average, a poor work evaluation, and his failure to produce any work product after ten weeks on his research assignment.  Brettler states that, in a meeting between Brettler, Dr. Sarahelen Thompson–the Head of the Department, and Professor Preckel, Dr. Thompson verbally terminated Brettler from his assistantship and from the program.  Dr. Thompson sent Brettler a letter on May 14, 2004, informing him that, because of his 2.33 grade point average, he was being placed on academic probation and that, as of May 7, 2004, his assistantship was terminated.

Brettler avers that arrangements had been made with Dr. Lovejoy ten weeks into the semester to submit assistantship work one month after the end of the semester.  Brettler also testifies that Dr. Thompson refused to let him drop any classes, despite Brettler's explanation that he had fallen too far behind in class due to his illness and the lack of accommodation by Purdue University.

One other graduate student's assistantship in the Department was terminated at the end of the Spring 2004 semester because that student had failed to maintain a 3.0 grade point average.

At the beginning of the Spring 2004 semester, Brettler requested roomier seating from the program coordinator because he is a "larger than average man," and Brettler states that the

7

coordinator overtly and carefully complied with this request.  Pl. Resp., ¶ 2 (Brettler Aff.).  He also

avers that, a few weeks into the semester, he informed the program coordinator that he needed space

to stand and move around to control his "narcoleptic condition," but that no accommodation was

made.[3]  *Id*. at ¶ 3.

At no time prior to or during the Spring 2004 semester did Brettler make any request for

accommodation or identify himself as an individual with a disability to Adaptive Services, which

is the department indicated on the Personal Information Sheet as the contact for all students who

have special requests due to a disability.

After the semester ended and after he was informed that his graduate assistantship was

terminated, Brettler contacted Purdue University's Affirmative Action Office.  Chad Martinez is the

Assistant Director for Conflict Resolution in the Affirmative Action Office, which works to

implement and uphold policies and practices that are consistent with state and federal laws for all

persons, including those with disabilities.  Over the telephone, Brettler spoke with Martinez on two

separate occasions concerning the Spring 2004 semester.  On both occasions, Brettler decided not

to work with or confide in Martinez in order to pursue resolution through Purdue University's

internal procedures because of Martinez's comment to Brettler that "his role is to protect the

University, not necessarily the student."  Pl. Resp., ¶ 4 (Brettler Aff.).  Brettler also declined to meet

with Martinez because the possible resolution Martinez had to offer, reinstatement, was

unsatisfactory to Brettler who had already had to make other living arrangements.

Brettler filed a charge of employment discrimination with the Equal Employment

Opportunity Commission ("EEOC") on June 17, 2004.  In the section of the charge titled

---

[3] Brettler provides no description of his medical condition, other than this reference to a "narcoleptic condition," and provides no medical records or evidence of any medical condition to this Court.

8

"Circumstances of Alleged Discrimination," he checked only the "Disability" box.  Also, on the same form, after the sentence providing, "This is notice that a charge of employment discrimination has been filed against your organization under," Brettler checked only "The Americans with Disabilities Act," leaving the box next to "Title VII of the Civil Rights Act" unchecked.  Finally, in the section titled "Particulars," Brettler stated, "On May 14, 2004, my Graduate Assistantship in the Department of Agricultural Economics was terminated.  I believe that I have been discriminated against in violation of The Americans with Disabilities Act of 1990 because of my disability."  Def. Br., Exh 6.  The EEOC issued its Dismissal and Notice of Rights to Brettler on October 19, 2004, indicating that it was closing its file on this charge because, after its investigation, the EEOC was unable to conclude that the information obtained established a violation of the statute.

In his Complaint filed with this Court on January 20, 2005, Brettler checked the box indicating that his Complaint was being brought pursuant to both Title VII and the ADA, asserting that his "rights to reasonable accommodation were denied."  Pl. Cmplt., p. 2.  In the Complaint, Brettler sets forth facts to support his claim, alleging that the "[d]efendant directed plaintiff to request accommodation through the academic department, not the disability office, then failed to provide adequate accommodation.  Defendant then lied about their rules in an effort to remove plaintiff."  *Id*.  Finally, Brettler requests "[c]ompensation for opportunity costs and punitive damages."  *Id*., p. 3.

**ANALYSIS**

In its Motion for Summary Judgment, Purdue University argues that (1) Brettler's claim under Title VII of the Civil Rights Act is barred because he did not file an EEOC charge under Title VII and also because he did not claim that he was the victim of any discrimination protected by Title

VII, (2) Brettler's claims of employment discrimination under Title VII of the Civil Rights Act and Title I of the ADA fail because he was not an "employee" of Purdue University, (3) Brettler's claim under Title I of the ADA claim is barred because Purdue University is an arm of the state entitled to Eleventh Amendment protection, (4) Purdue University was in compliance with Title VII of the Civil Rights Act and Titles I and II of the ADA because Brettler is not an individual with a disability and did not make appropriate requests for reasonable accommodations, and (5) Brettler is not entitled to damages under Title VII or to punitive damages under 28 U.S.C. § 1981a(b)(1).

## A.  Title VII

In its Motion for Summary Judgment, Purdue University argues that it is entitled to judgment as a matter of law on Brettler's claim of Title VII employment discrimination because Brettler's EEOC charge alleges disability discrimination under the ADA but makes no charge of discrimination under Title VII.  Also, Purdue University contends that Brettler alleges no conduct by Purdue University that violates Title VII because he has not asserted any discrimination against himself based on any of the protected classes under Title VII.

Brettler offers no response to these arguments.  Brettler's Title VII claim must fail as a matter of law because he has not stated a cognizable claim under Title VII and because he has failed to exhaust administrative remedies on any potential claim under Title VII.

As a prerequisite to filing a complaint under Title VII, a plaintiff must first file a timely charge of employment discrimination with the EEOC that encompasses the conduct complained of and subsequently must receive a statutory notice of right to sue from the EEOC.  *See* 42 U.S.C. § 2000e-5(e), (f); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974); *Cheek v. Western and*

*S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 863

(7th Cir. 1985). Therefore, as a general rule, a Title VII plaintiff cannot bring a claim in a lawsuit

that was not encompassed in the EEOC charge. *Cheek*, 31 F.3d at 500 (citing *Alexander*, 415 U.S.

at 47). To determine whether an EEOC charge encompasses the claims alleged in a Title VII

complaint, courts apply the *Jenkins* test by considering whether the Title VII claims set forth in the

complaint (1) are like or reasonably related to the allegations of the EEOC charge, and (2) can

reasonably be expected to grow out of such allegations. *Cheek*, 31 F.3d at 500; *Jenkins v. Blue*

*Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir.), *cert. denied*, 429 U.S. 986 (1976). At a

minimum, a factual relationship must exist between the EEOC charge and the complaint such that

the charge and the complaint describe the same conduct and implicate the same individuals. *Gawley*

*v. Indiana Univ.*, 276 F.3d 301, 313 (7th Cir. 2001); *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d

473, 481 (7th Cir. 1996) (citing *Cheek*, 31 F.3d at 501).

    This filing prerequisite serves the dual purpose of affording the EEOC and the employer an

opportunity to settle disputes through conference, conciliation, and persuasion and of giving the

employer some warning of the conduct about which the employee is aggrieved. *Cheek*, 31 F.3d at

500. Therefore, "allowing a complaint to encompass allegations outside the ambit of the predicate

EEOC charge would frustrate the EEOC's investigatory and conciliatory role, as well as deprive the

charged party of notice of the charge." *Id.* (citing *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110

(7th Cir. 1992)); *see also Babrocky*, 773 F.2d at 863. However, because EEOC charges are often

completed by laypersons, a Title VII plaintiff need not allege each and every fact in the charge that,

in the aggregate, form the basis of the claims in the complaint. *Cheek*, 31 F.3d at 500; *Babrocky*,

773 F.2d at 865-66 (holding that it is an error for a court to require an exact correspondence between

11

the words of an EEOC charge and the contents of a Title VII complaint and that EEOC charges are to be construed with "utmost liberality").  If the body of the text of the complaint clearly suggests a particular claim, it may proceed even though the appropriate box may not be checked.  *Wiggen v. Leggett & Platt, Inc.*, No. 03 C 1986, 2004 WL 524449, *3-4 (N.D. Ill. Feb. 23, 2004).

In his charge filed with the EEOC, Brettler checked only the "Disability" box in the sections titled "Circumstances of Alleged Discrimination" and "Discrimination Based On;" he did not check any of the remaining boxes, which were: "race," "color," "sex," "religion," "national origin," "age," "retaliation," and "other."  On the same form, after the sentence reading, "This is notice that a charge of employment discrimination has been filed against your organization under," Brettler only checked "The Americans with Disabilities Act," leaving the box next to "Title VII of the Civil Rights Act" unchecked.  Finally, in the section titled "Particulars," Brettler stated, "On May 14, 2004, my Graduate Assistantship in the Department of Agricultural Economics was terminated.  I believe that I have been discriminated against in violation of The Americans with Disabilities Act of 1990 because of my disability."  Def. Br., Exh. 6.

Yet, when Brettler filed his Employment Discrimination Complaint with this Court, he checked that his Complaint was being brought pursuant to both Title VII and the ADA, asserting that his "rights to reasonable accommodation were denied."  In the section of the Complaint titled "Facts in Support of Complaint," Brettler declares that the "Defendant directed plaintiff to request accommodation through the academic department, not the disability office, then failed to provide adequate accommodation.  Defendant then lied about their rules in an effort to remove plaintiff."  Pl. Cmplt.

At a minimum, the factual basis for Brettler's Complaint is identical to that of his EEOC Charge. In both, he alleges that he was discriminated against based on his disability and that he was denied reasonable accommodations for his disability. This common factual basis is sufficient to permit the maintenance of Brettler's ADA claims in federal court, as the ADA is the appropriate statutory vehicle for asserting a claim of discrimination due to a person's disability. *See* 42 U.S.C. §§ 12112, 12132 (prohibiting discrimination in employment and public services, respectively).

However, Brettler asserts no factual basis in his EEOC Charge that supports a claim under Title VII. Claims may be brought under Title VII for allegations of discrimination based on race, color, religion, sex, or national origin, but Title VII does not offer a remedy for a claim of discrimination based on disability. *See* 42 U.S.C. § 2000e-2(a)(1). Brettler made no allegation in his EEOC charge of discrimination based on race, color, religion, sex, or national origin. Nor does he assert any facts in his Complaint or in the briefing on the instant motions that he was discriminated against by Purdue University on any of the actionable bases under Title VII. Because Brettler has not asserted any factual basis in his Complaint for discrimination based on race, color, religion, sex, or national origin, Brettler cannot sustain his claim under Title VII. Accordingly, the Court grants summary judgment in favor of Purdue University on Brettler's Title VII claim. Even if Brettler had asserted a basis for discrimination under Title VII in his Complaint, he did not assert any such basis in his EEOC charge and, therefore, failed to exhaust his administrative remedies for any potential claim under Title VII. *See* 42 U.S.C. § 2000e-5(e) (charge requirement).

### B. State Immunity from Suit Under Title I of the ADA

Title I of the ADA prohibits certain employers, including the States, from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a); *see also* 42 U.S.C. § 12111(2), (5), & (7).  Brettler asserts employment discrimination by Purdue University during his time as a Graduate Assistant receiving a modest remuneration when Purdue University allegedly failed to provide adequate accommodation and then allegedly attempted to remove him from the graduate program.

The United States Supreme Court has held that suits brought by State employees[4] seeking money damages against a State for violations of Title I of the ADA are barred by the Eleventh Amendment.  *Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 360 (2001); *see also Tennessee v. Lane*, 541 U.S. 509, 514 (2004) (recognizing the holding in *Garrett*).  Generally, state universities are held to be state agencies entitled to Eleventh Amendment immunity, primarily because of their financial reliance on the State.  *See Kashani v. Purdue Univ.*, 813 F.2d 843, 845 (7th Cir. 1987) (finding that the "vast majority of cases considering the issue have found state universities to be forfended by the Eleventh Amendment" and noting the inability of the parties and the Court to reveal a single circuit court opinion holding a state university not entitled to Eleventh Amendment immunity); *see also Davidson v. Board of Governors of State Colls. and Univs. for W. Ill. Univ.*, 920 F.2d 441, 442 (7th Cir. 1990) (finding that Western Illinois University was a state

---

[4] In its motion, Purdue University asserts that Brettler, as a graduate assistant, was not an "employee" of Purdue University.  However, the Court does not reach the issue of whether Brettler was an employee of Purdue University as a graduate assistant because a private suit for damages under Title I of the ADA by an employee against Purdue University is barred by the Eleventh Amendment, as set forth in detail in Part B.

agency for purposes of Eleventh Amendment immunity).  Further, *Kashani* explicitly found that Purdue University is a state agency for purposes of Eleventh Amendment immunity based on an examination of its financial autonomy and its legal status.  813 F.2d at 945-47 (finding that Purdue University is an arm of the state entitled to Eleventh Amendment immunity and a not a political subdivision, which would not enjoy the same immunity).

In the instant matter, Brettler is a private individual bringing a suit for money damages under Title I of the ADA against Purdue University in federal court.  As Purdue University is a state agency entitled to Eleventh Amendment immunity, Brettler's claim under Title I of the ADA is barred.  Accordingly, the Court grants summary judgment in favor of Purdue University on Brettler's claim under Title I of the ADA.

## C.  Employment Claims Under Title II of the ADA

The ADA consists of five titles: Employment (Title I), Public Services (Title II), Public Accommodations and Services Operated by Private Entities (Title III), Telecommunications (Title IV), and Miscellaneous Provisions (Title V).  *See* Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 327, 327-28 (1990).  Title II, titled Public Services, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

The Federal Courts of Appeals are divided as to whether a claim for employment discrimination against a governmental entity is authorized under Title II, in light of the express establishment of a cause of action for disability discrimination in employment against such entities

under Title I. *Compare Bledsoe v. Palm Beach County Soil & Water Conservation Dist.*, 133 F.3d

816, 820 (11th Cir.) (holding that Title II covers employment discrimination), *cert. denied* 525 U.S.

826 (1998),[5] *with Zimmerman v. Oregon Dep't of Justice*, 170 F.3d 1169, 1173 (9th Cir. 1999)

(holding that a public employee cannot bring a claim of employment discrimination under Title II).[6]

*See also Garrett*, 531 U.S. at 360 n.1 (recognizing the split between *Bledsoe* and *Zimmerman* and

declining to address the issue of "whether Title II of the ADA, dealing with the 'services, programs,

or activities of a public entity,' 42 U.S.C. § 12132, is available for claims of employment

discrimination when Title I of the ADA expressly deals with that subject").

The Seventh Circuit has not addressed this issue but has acknowledged the split in authority

among the circuits. *See Staats v. County of Sawyer*, 220 F.3d 511, 518 (7th Cir. 2000).[7]  District

---

[5] Other circuit courts have assumed that or declined to decide whether employment claims against public entities may be brought under Title II of the ADA. *See, e.g., McKibben v. Hamilton County*, No. 99-3360, 2000 WL 761879, * 4 (6th Cir. May 30, 2000) (declining to decide whether a plaintiff may assert a Title II employment discrimination claim because the defendant had not challenged the plaintiffs ability to bring the claim and addressing the employment claim on the merits); *Davoll v. Webb*, 194 F.3d 1116, 1128-29 (10th Cir. 1999) (declining to decide whether Title II covers employment actions because the issue does not implicate subject matter jurisdiction); *Rogers v. Department of Health & Envtl. Control*, 174 F.3d 431, 433 (4th Cir. 1999) (permitting a plaintiff to bring a Title II employment discrimination claim without discussion of Title II's applicability to employment, relying on the second clause of § 12132); *Holmes v. Texas A&M Univ.*, 145 F.3d 681, 682-83 (5th Cir. 1998) (assuming, without analysis, that employment claims may be brought under Title II).

[6] The Sixth Circuit has held that Title I exclusively addresses employment discrimination under the ADA, finding that a claim of employment discrimination may not be brought under Title III (Public Accommodation). *Parker v. Metropolitan Life Ins. Co.*, 121 F.3d 1006, 1014-15 (6th Cir. 1997).

[7] In both *Jackson v. City of Chicago*, 414 F.3d 806 (7th Cir. 2005), and *Silk v. City of Chicago*, 194 F.3d 788 (7th Cir. 1999), a plaintiff brought a claim of discrimination under Title II of the ADA against a former employer.  The district courts in both cases addressed whether a claim for employment discrimination is actionable under Title II and decided to allow the cases to go forward. *See Jackson*, 215 F. Supp. 2d at 977 (allowing the employment discrimination claim to go forward under Title II after recognizing the circuit split on the issue of whether an employment claim is actionable under Title II of the ADA but declining to analyze the issue in anticipation of forthcoming illumination by the Supreme Court or the Seventh Circuit in the near future); *Silk*, 1996 WL 312074 at *10 (relying on Department of Justice regulation 28 C.F.R. § 35.140 to find that Title II is applicable to employment but recognizing that Title II does not have the same administrative requirements as Title I, thus, allowing the cause of action that had been dismissed under Title I based on the statute of limitations to go forward on the merits under Title II).

However, the Seventh Circuit did not consider the question on appeal in either case. *See Jackson*, 414 F.3d 806; *Silk*, 194 F.3d 788.  In *Jackson*, the Seventh Circuit affirmed the district court's grant of summary judgment in favor of the defendant on the ground that the plaintiff could not raise a genuine issue of material fact as to whether she was a

courts within the Seventh Circuit are also divided on this issue. *Compare Silk v. City of Chi.*, No. 95 C 0143, 1996 WL 312074, *12 (N.D. Ill. June 7, 1996) (holding that Title II applies to claims of employment discrimination primarily based on the regulations promulgated by the Attorney General, specifically 28 C.F.R. § 35.140); *Dertz v. City of Chi.*, 912 F. Supp. 319, 323-24, 325 (N.D. Ill. 1995) (applying Title II to an employment claim brought against a public entity for denial of disability benefits, finding that disability benefits are a "program" under Title II); *Doe v. County of Milwaukee*, 871 F. Supp. 1072, 1074-75 (E.D. Wis. 1995) (relying on 28 C.F.R. § 35.140 to find that Title II applies to employment); *and Petersen v. University of Wis. Bd. of Regents*, 818 F. Supp. 1276, 1278 (W.D. Wis. 1993) (declining to find that Title II does not apply to employment discrimination because the defendant did not clearly address the issue and based on the absence of any language prohibiting such a claim and on the Department of Justice regulation found at 28 C.F.R. § 35.140 referencing employment discrimination), *with Clark v. City of Chi.*, No. 97 C 4820, 2000 WL 875422, *6 (N.D. Ill. June 28, 2000) (holding that Title II does not cover claims of employment discrimination against a public employer); *and Patterson v. Illinois Dep't of Corr.*, 35 F. Supp. 2d 1103, 1109-10 (C.D. Ill. 1999) (same).[8]

_____

"qualified individual with a disability" as defined in 42 U.S.C. § 12111(8) (Title I). In doing so, the court applied and analyzed the Title I definition of "qualified individual with a disability," 42 U.S.C. § 12111(8), and the Title I definition of "reasonable accommodation" under 42 U.S.C. § 12111(9). *See Jackson*, 414 F.3d at 811-13. Similarly, in *Silk*, the court affirmed the district court's grant of summary judgment in favor of the defendant on the plaintiff's claims of retaliation brought under 42 U.S.C. § 12203(a) and hostile work environment/harassment. *Silk*, 194 F.3d at 800-01, 802-03, 808.

      Accordingly, the Seventh Circuit has not directly addressed the question of whether Title II applies to employment since its recognition of the circuit split on the issue in *Staats v. County of Sawyer*, 220 F.3d 511, 518 (7th Cir. 2000). Therefore, in the absence of clear direction from the Seventh Circuit on this issue, the Court must consider whether employment claims may properly be brought under Title II of the ADA.

      [8] A similar split exists among the district courts in the Second Circuit Court of Appeals. *See Sacca v. Buffalo State College, State University of New York*, No. 01-CV-881A, 2004 WL 2095458, *3-4 (W.D.N.Y. Sept. 20, 2004) (comparing "*Sworm v. Western New York Children's Psychiatric Center*, 269 F. Supp. 2d 152 (W.D.N.Y. 2003) (holding that plaintiff should not be allowed to circumvent Supreme Court's decision in Garrett by alleging a disability discrimination in employment claim against the state utilizing Title II when that title lacks any of the procedural

Neither party to this case has raised the applicability of Title II to Brettler's claims. However, because Brettler, who is proceeding *pro se*, has brought a claim of employment discrimination against Purdue University, a public entity covered by Title II, the Court addresses whether a cause of action for employment discrimination may be brought under Title II of the ADA. In the absence of guiding mandatory authority on this issue and being in agreement with the careful analysis of courts such as those issuing decisions in *Zimmerman* and *Patterson*, the Court finds that Title II of the ADA does not encompass employment discrimination.

*1. Chevron Analysis of 28 C.F.R. § 35.140(a)*

Pursuant to the grant of authority by Congress in 42 U.S.C. § 12134(a), the Attorney General promulgated a regulation applying Title II to employment: "No qualified individual with a disability shall, on the basis of disability, be subjected to discrimination in employment under any service, program, or activity conducted by a public entity." 28 C.F.R. § 35.140(a). In addition, § 35.140 cross-references Title I, which explicitly addresses employment discrimination by its title and its terms: "For purposes of this part, the requirements of Title I of the Act, as established by the regulations of the Equal Employment Opportunity Commission in 29 CFR part 1630, apply to

protections of Title I); *Filush v. Town of Weston*, 266 F. Supp. 2d 322 (D. Conn. 2003) (holding that the plain language and structure of the ADA indicates that Title II was not intended to apply to employment discrimination); *and Syken v. New York*, No. 02 Civ. 4673, 2003 WL 1787250 (S.D.N.Y. April 12, 2003) (holding that plain language of Title II indicates that it is not applicable in the employment context), *with, Winokur v. Office of Court Admin.*, 190 F. Supp. 2d 444 (E.D.N.Y. 2002) (holding that the second phrase in Title II, "or be subjected to discrimination by any such [public] entity," together with the legislative history of Title II, indicates that disability discrimination claim in employment can be brought under Title II); *and Hernandez v. City of Hartford*, 959 F. Supp. 125 (D. Conn. 1997) (holding that although language of Title II is silent as to employment discrimination claim, the legislative history and regulations make clear that action for disability discrimination in public employment can be brought under Title II)").

18

employment in any service, program, or activity conducted by a public entity if that public entity is also subjected to the jurisdiction of Title I." 28 C.F.R. § 35.140(b)(1). If the entity is not subjected to the jurisdiction of Title I, then the requirements of section 504 of the Rehabilitation Act of 1973 will apply. 28 C.F.R. § 35.140(b)(2). Through these regulations, the Attorney General has construed the ADA as allowing a cause of action for discrimination in employment under Title II.

A basic and unexceptional principle of statutory construction is that "courts must give effect to the clear meaning of statutes as written." *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476 (1992). However, as in this case, that "principle can at times come into some tension with another fundamental principle of our law, one requiring judicial deference to a reasonable statutory interpretation by an administering agency." *Id.* (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). As noted in *Patterson*, there is a tension between (1) the regulations promulgated by the Attorney General applying Title II to employment and (2) the statutory language of Title II and the structure of the statute as a whole. 35 F. Supp. 2d at 1106 (citing *Cowart*, 505 U.S. at 476). This Court's examination of the relationship between 28 C.F.R. § 35.140(a) and Title II as related to the statutory interpretation of Title II's applicability to employment is governed by *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

In *Chevron*, the Supreme Court established a two-step analysis for the review of an administrative agency's interpretation of a statute that it administers. *See Texas Indep. Producers and Royalty Owners Ass'n v. E.P.A.*, 410 F.3d 964, 978 (7th Cir. 2005) (citing *Chevron*, 467 U.S. at 842-44). Under the first step, a court must determine "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. The "traditional tools of statutory

19

construction" are utilized in this determination. *Id*. at 843 n. 9. At this step, a court focuses solely

on the text of the statute. *United States v. Dierckman*, 201 F.3d 915, 923 n.12 (7th Cir. 2000) (citing

*Bankers Life & Cas. Co. v. United States*, 142 F.3d 973, 983 (7th Cir.1998)). If the intent of

Congress is clear from the statutory language, the court must "give effect to the unambiguously

expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. However, if the statute is "silent or

ambiguous with respect to the specific issue," a court must continue on to step two of the analysis

and decide whether the Agency's interpretation is based on a permissible construction of the statute.

*Id*. at 843. At this step, a court considers whether the construction is "arbitrary, capricious, or

manifestly contrary to the statute." *Id*. at 844. The Seventh Circuit has cautioned that "a court must

not substitute its own construction of a statutory provision for a reasonable interpretation by the

agency in question." *Bankers Life and Cas. Co.*, 142 F.3d at 983 (citation and internal quotation

marks omitted).

As set forth in detail below, based on an examination of the statutory text, the Court finds

that Congress unambiguously expressed its intent that Title II not apply to employment; therefore,

the Court stops at the first step of the analysis and affords no deference to 28 C.F.R. § 35.140(a)

promulgated by the Attorney General under Title II. *See, e.g.*, *Zimmerman*, 170 F.3d at 1173

(according no weight to 28 C.F.R. § 35.140(a), having found that "Congress unambiguously

expressed its intent for Title II not to apply to employment"); *Patterson*, 35 F. Supp. 2d at 1108

(same).

*2. Statutory Interpretation*

a. Title II

The Court begins by considering the language of Title II itself, which provides, "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The only terms defined by the statute are "public entity" and "qualified individual with a disability." *Id.* at 12131. "Public entity," as defined in Title II, includes any state or local government and any department, agency, special purpose district, or other instrumentality of a state or local government. *See* 42 U.S.C. § 12131(1). "Qualified individual with a disability" is discussed in more detail below. Notably, Title II does not define the terms "services," "programs," or "activities."

In the absence of a statutory definition, words are normally construed in accord with their natural or ordinary meaning. *Smith v. United States*, 508 U.S. 223, 228 (1993); *Trustees of the Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund v. Leaseway Transp. Corp.*, 76 F.3d 824, 828 (7th Cir. 1996). Courts addressing the terms "services," "programs," or "activities" as found in Title II have described the terms as applying only to the "outputs" or "products" of a public agency rather than to "inputs," such as employment. *See Zimmerman*, 170 F.3d at 1174 ("outputs" and "inputs"); *Clark*, 2000 WL 875422 at *4 ("products"), *Decker v. University of Houston*, 970 F. Supp. 575, 578 (S.D. Tex. 1997) ("outputs" and "inputs"). Services, programs, or activities of public entities, such as public transportation or parks and recreation facilities, are commonly thought to be "products" or "outputs." *See, e.g., Crowder v.*

21

*Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996) (providing examples of "services, programs, or activities"). In contrast, employment is not commonly thought of as a service, program, or activity of a public entity. *See Zimmerman*, 170 F.3d at 1174 (discussing, with examples, the common understanding of services, programs, and activities). In addition, the terms "participation in" and "benefits of" in the statute indicate that the services, programs, or activities are offered by the public entities for the general public and are not an "input" brought in for the benefit of the entity, as would be the case with employment.

Accordingly, the first clause of Title II–"no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity," 42 U.S.C. § 12132–does not contain language demonstrating that Congress intended for Title II to apply to employment discrimination. Most courts, regardless of their finding on the applicability of Title II to employment, have expressly or implicitly interpreted the first clause as not applying to employment. *Zimmerman*, 170 F.3d at 1174-75 (making this distinction and identifying cases). Courts finding that Title II does not apply to employment have so found explicitly. *See Zimmerman*, 170 F.3d at 1174-75 (citing *Decker*, 970 F. Supp. at 578; *Larramendy v. San Mateo County Transit Dist.*, No. 97-3436, 1998 WL 456283, at *3 n. 1 (N.D. Cal. July 30, 1998); *Iskander v. Rodeo Sanitary Dist.*, No. C-94 0479-SC, 1995 WL 56578, at *9 (N.D. Cal. Feb. 7, 1995)); *see also Koslow v. Pennsylvania*, 158 F. Supp. 2d 539, 542 (E.D. Pa. 2001), *rev'd on other grounds*, 302 F.3d 161 (3d Cir. 2002); *Clark*, 2000 WL 875422 at *6; *Patterson*, 35 F. Supp. 2d at 1108.

Many of the courts finding that Title II does apply to employment have relied on the second clause of the title. The second clause of Title II provides that "no qualified individual with a

disability shall, by reason of such disability, . . . be subjected to discrimination by any such entity."

The courts interpret this second clause as distinct from the first and find that it addresses any form

of discrimination by a public entity, not just discrimination in services, programs, or activities.  *See*

*Zimmerman*, 170 F.3d at 1175 (citing *Bledsoe*, 133 F.3d at 822; *Innovative Health Sys., Inc. v. City*

*of White Plains*, 117 F.3d 37, 44-45 (2d Cir. 1997); *Alberti v. City & County of San Francisco*

*Sheriff's Dept.*, 32 F. Supp. 2d 1164, 1169 (N.D. Cal. 1998); *Downs v. Massachussetts Bay Transp.*

*Auth.*, 13 F. Supp. 2d 130, 135 (D. Mass. 1998)); *see also Silk*, 1996 WL 312074 at *10, 12, 13, 13

n.22; *Ethridge v. State of Ala.*, 847 F. Supp. 903, 905 (M.D. Ala. 1995); *Petersen*, 818 F. Supp. at

1278.

However, the Court finds that this reading of the second clause as independent of the first

takes the second clause out of the context of the "services, programs, or activities" wording and,

thus, the Title as a whole.  *See Zimmerman*, 170 F.3d at 1175.  First, the first and second clauses

comprise a single sentence, which implies that the prohibited discrimination in the second clause

by the same public entities referenced in the first clause also applies in the services, programs, or

activities of the entity.  *See id*.  Grammatically, "discrimination" could not be included in a series

in the same clause with "excluded from participation in" and "denied the benefits of," which are

found in the first clause, because discrimination is done by the public entity whereas the exclusion

from and denial of are as to the services, programs, or activities of a public entity.  Moreover, Title

II is titled "Public Services," which suggests that the entire title, including the discrimination in the

second clause, applies to public services.  *See id*. (citing *Almendarez-Torres v. United States*, 523

U.S. 224, 234 (1998) (holding that "'the title of a statute and the heading of a section' are 'tools

available for the resolution of a doubt' about the meaning of a statute") (citations omitted)).

Most importantly, however, the remainder of Title II unambiguously demonstrates that Congress did not intend for Title II to apply to employment discrimination. To prevail on any claim under Title II, a plaintiff must demonstrate that he is a "qualified individual with a disability." *See* 42 U.S.C. § 12132. "Qualified individual with a disability" is defined under Title II as

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). Because a plaintiff must be an individual who "meets the essential eligibility requirements for the *receipt of services* or the *participation in programs or activities* provided by a public entity," the second clause of § 12132, prohibiting "discrimination by any such entity," necessarily relates back to the "services, programs, or activities" set forth in the first clause. As discussed above, securing or retaining employment is not a service, program, or activity of a public entity. Therefore, there is no basis in the language of Title II itself for finding that Title II, 42 U.S.C. § 12132, applies to employment.

b. The ADA as a Whole

In addition, the Court finds that the language of the ADA as a whole demonstrates that Congress unambiguously intended for Title II not to cover employment. Most noticeably, Title I's comprehensive treatment of employment matters renders any reading of employment into Title II redundant, which violates the "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant." *Kungys v. United States*, 485 U.S. 759, 778 (1988); *see also Pennsylvania Dep't of Public Welfare v. Davenport*, 495 U.S. 552, 562 (1990) (recognizing the

Supreme Court's "deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment").  "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Russello v. United States*, 464 U.S. 16, 23 (1983).

First, Title I of the ADA is entitled "Employment," whereas Title II is entitled, "Public Services."  *See* 42 U.S.C. §§ 12111, 12131.  In contrast with Title II, which makes no reference to employment or employment related matters, Title I is replete with employment-specific terms such as "employee," "employer," "employment," "job," "work schedules," "job application procedures," "hiring," "advancement," "discharge of employees," "employee compensation," "job training," and "terms, conditions, and privileges of employment."  42 U.S.C. §§ 12111, 12112.  A "covered entity" under Title I is defined as "an employer, employment agency, labor organization, or joint labor-management committee," 42 U.S.C. § 12111(2), whereas the "public entity" under Title II is defined as any state or local government, any department, agency, special purpose district, or other instrumentality of a state or local government, and the National Railroad Passenger Corporation and any commuter authority, *see* 42 U.S.C. § 12131(1)(A)-(C).  Under Title I, the terms "person," "labor organization," "employment agency," "commerce," and "industry affecting commerce" were given the same meaning as those terms were given in § 2000e, which is part of Title VII, covering discrimination in employment.

This distinction between Title I and Title II is prominently noted in the definition of the term "qualified individual with a disability" in each title.  The term in Title I addresses a person's qualifications to work, whereas in Title II, the term considers the individual's eligibility to receive

services or to participate in programs or activities provided by a public entity.  Title I defines a

"qualified individual with a disability" as

> an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8).  In contrast, Title II defines a "qualified individual with a disability" as

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, *meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity*.

42 U.S.C. § 12131(2) (emphasis added).  Only those who are a "qualified individual with a

disability" are entitled to benefits under Title I and Title II.  The definition of the term in Title I is

grounded in the employment context, whereas there is a total absence of any such language in Title

II's definition.  Title I also provides that the term "'qualified individual with a disability' shall not

include any employee or applicant who is currently engaging in the illegal use of drugs, when the

covered entity acts on the basis of such use." 42 U.S.C. § 12114.  Title II contains no such provision

excepting employees or applicants engaged in the illegal use of drugs.

Similarly, the term "reasonable accommodation" underscores the applicability of Title I and

inapplicability of Title II to employment.  Title I provides,

> The term "reasonable accommodation" may include–
> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of

> qualified readers or interpreters, and other similar accommodations for individuals
> with disabilities.

42 U.S.C. § 12111(9).  Thus, Title I defines "reasonable accommodation" within the realm of

employment and the workplace.  In contrast, Title II, which references "reasonable modification"

in the definition of "qualified individual with a disability" in § 12131, does not define "reasonable

modification."  Nor, as noted above, does the definition of "qualified individual with a disability"

reference employment matters.

As recognized in *Patterson*, Title I comprehensively addresses disability discrimination in

employment and contains numerous provisions not discussed above related to employment, yet Title

II contains no such provisions.  35 F. Supp. 2d at 1109.  Nor does Title II incorporate by reference

the provisions of Title I for the purpose of any claim based on employment under Title II.  For

example, Title I establishes defenses for employers against whom a claim of employment

discrimination has been brought, such as job-related qualifications, business necessity, preferences

by religious entities, and refusal to employ food handling employees with a qualified infectious or

communicable disease.  *See* 42 U.S.C. § 12113.  None of these provisions are contained in Title II

nor are they incorporated into Title II by reference.

Another difference between the titles indicating that Title II does not apply to employment

is that Title I incorporates administrative prerequisites not required under Title II.  Title I

incorporates its remedies and procedures from Title VII of the Civil Rights Act, whereas Title II

incorporates various provisions of Section 504 of the Rehabilitation Act.  *See* 42 U.S.C. § 12117(a)

(Title I) (adopting the "powers, remedies, and procedures" of various provisions of Title VII of the

Civil Rights Act of 1964, as amended); 42 U.S.C. § 12133 (Title II) (incorporating the "remedies,

procedures, and rights" set forth in section 29 U.S.C. § 794a, the Rehabilitation Act).  Thus, Title

I, like Title VII, requires that an employee file a charge of discrimination with the EEOC prior to filing a complaint in federal court.  *See* 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e-5). In contrast, § 504 of the Rehabilitation Act[9] does not require a plaintiff to pursue any relief through the EEOC prior to filing a civil complaint.  *See* 29 U.S.C. § 794a(a)(1) (adopting the remedies, procedure, and rights set forth in 42 U.S.C. § 2000e-16, including 42 U.S.C. § 2000e-5(f)-(k), which does not incorporate the requirement that a charge be filed with the EEOC).   Nor does the Rehabilitation Act require that a plaintiff exhaust federal administrative remedies under § 504 when bringing a private suit against a recipient of federal funding solely under § 504.  *See Dertz*, 912 F. Supp. at 324; *Doe v. County of Milwaukee*, 871 F. Supp. 1072, 1075 (E.D. Wis. 1995); *Byers v. Rockford Mass Transit Dist.*, 635 F. Supp. 1387, 1389 (N.D. Ill. 1986) (citing cases).

Both Title I and Title II expressly apply to state and local governments, but only Title I, which is entitled "Employment," additionally applies to private entities.  *See* 42 U.S.C. §§ 12111(5), 12131(1).   Thus, if Title II is applicable to employment, public employees have the enviable alternative of avoiding the procedural requirements of Title VII when a claim is brought under Title I by bringing suit under Title II.   Thus, the charge requirements under Title I are superfluous for public employees if employment claims are permitted under Title II.

---

[9] Section 504 of the Rehabilitation Act provides, in relevant part:

No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).

The Court declines to interpret the statute such that Title II allows public employees of state or local government to sidestep the administrative prerequisites under Title I to the exclusion of employees of private employers.   Such a result would also preclude the EEOC and the public employer from engaging the devices available under Title VII of investigation and settlement and, after a finding of reasonable cause, of conference, conciliation, and persuasion prior to the filing of suit.  *See, e.g.*, 29 C.F.R. §§ 1601.15, 1601.18(d), 1601.20, 1601.24.   Moreover, a statutory interpretation that applies Title II to employment renders the statute redundant as to public employees of state or local government with fifteen or more employees who could bring an employment cause of action under either title.  *See* 42 U.S.C. § 12111(5)(A) (defining "employer" for the purposes of Title I as "a person . . . who has 15 or more employees").  Such an interpretation violates the cardinal rule of statutory interpretation "that no provision should be construed to be entirely redundant."  *Kungys,* 485 U.S. at 778.

Another difference in the statutory structure between Title I and Title II is the delegation of authority to promulgate regulations by Congress under each title.  Under Title I, Congress delegated the regulatory authority to the EEOC, whereas the authority under Title II is delegated to the Attorney General.  *See* 42 U.S.C. § 12116 (Title I - EEOC); 42 U.S.C. § 12134(a) (Title II - Attorney General).   Thus, just as public employees would be subject to different procedural prerequisites by bringing an employment suit under Title II, so too might public employees be subject to different or conflicting regulations regarding employment under Title I and Title II. Notably, in enacting Title I, Congress directed the EEOC, in the enforcement of Title VII, and the Attorney General, in the enforcement of the Rehabilitation Act provisions regarding employment, to

> develop procedures to ensure that administrative complaints filed under [Title I] and under the Rehabilitation Act of 1973 are dealt with in a manner that avoids duplication of effort and prevents imposition of inconsistent or conflicting standards for the same requirements under [Title I] and the Rehabilitation Act of 1973.

42 U.S.C. § 12117(b).  No such provision was incorporated in Title II for the coordination of regulations between the titles with respect to employment.  *See Zimmerman*, 170 F.3d at 1178.

c.  Conclusion

In summary, both the language of Title II itself as well as the language and structure of the ADA as a whole unambiguously demonstrate that Congress did not intend for Title II to apply to employment.   Accordingly, under *Chevron*, the Court affords no weight to the regulation promulgated by the Attorney General.  In addition, the Court need not consider legislative history or other materials outside of the statute itself as the language of the statute is unambiguous.  *See City of Chicago v. U.S. Dept. of Treasury, Bureau of Alcohol, Tobacco and Firearms*,  423 F.3d 777, 781 (7th Cir. 2005) (citing *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, --- U.S. ----, ----, 125 S.Ct. 2611, 2626 (2005) ("As we have repeatedly held, the authoritative statement is the statutory text, not the legislative history or any other extrinsic material.  Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms.").[10]  Therefore, employment discrimination is not actionable under Title II of the ADA, and the Court grants summary judgment in favor of Purdue University on Brettler's claim of employment discrimination under Title II.

---

[10] In *Bledsoe v. Palm Beach County Soil and Water Conservation Dist.*, 133 F.3d 816 (11th Cir. 1998), which explicitly held that Title II applies to claims of employment discrimination, the court relies primarily on the Department of Justice regulations and legislative history in its analysis.  133 F.3d at 821-823.  Specifically, the reasoning based on the relationship between Title II and the Rehabilitation Act is grounded in legislative history.  *Id.* at 821-22.

**D.  Brettler's Claim of Failure to Accommodate in Education Under Title II of the ADA**

Brettler's remaining claim is a failure to accommodate in higher education under Title II of the ADA.  Although Brettler filed an Employment Discrimination Complaint with this Court, a fair reading of the Complaint supports a claim of failure to accommodate when Purdue University allegedly did not make reasonable accommodations for Brettler in his graduate studies that led to the loss of his assistantship and allegedly to his dismissal from the program.  Brettler pursues these arguments in his Motion for Summary Judgment and in his Response to Purdue University's Motion for Summary Judgment.

Before addressing the merits of such a claim, the Court must, once again, turn to the question of Eleventh Amendment immunity from suit.  In *Garrett*, although the Supreme Court held that the Eleventh Amendment bars private suits for money damages against the States under Title I of the ADA, the Court declined to consider whether immunity would also bar claims against the States under Title II of the ADA, as the parties had not briefed the issue.  *See Garrett*, 531 U.S. at 360, 360 n.1.  However, in *Tennessee v. Lane*, 541 U.S. 509 (2004), the Supreme Court held that Title II of the ADA, as applied to cases concerned with the fundamental right of access to the courts, constitutes valid legislation under § 5 of the Fourteenth Amendment and that Congress abrogated the States Eleventh Amendment immunity from suit for such claims.  *See* 541 U.S. at 531.  Notably, the holding in *Lane* was narrowly crafted and limited to cases implicating the accessibility of judicial services.  *See Lane*, 541 U.S. at 531; *see also Constantine v. Rector and Visitors of George Mason Univ.*, 411 F.3d 474, 486 (4th Cir. 2005).

In the context of public education, the Fourth Circuit in *Constantine* and the Eleventh Circuit in *Association for Disabled Americans, Inc. v. Florida International University* expanded the

holding of *Lane* to find that Title II of the ADA is valid legislation enacted pursuant to § 5 of the Fourteenth Amendment as applied to public higher education and that the Eleventh Amendment does not pose as a bar to claims against the States under Title II of the ADA for such claims.  *See Constantine*, 411 F.3d at 490 (relying on the analysis of both *Lane* and *Garrett*); *Association for Disabled Ams., Inc. v. Florida Int'l Univ.*, 405 F.3d 954, 959 (11th Cir. 2005) (same).

The Seventh Circuit has not addressed Eleventh Amendment immunity under Title II since *Lane*.  However, prior to *Lane*, the Seventh Circuit held that the States are immune from suit under Title II of the ADA "to the extent that it requires accommodation of disabilities (rather than simply requiring the state to disregard disabilities) and to the extent that it forbids a state to take account of disabilities that are rationally related to permissible objects of public action."  *Walker v. Snyder*, 213 F.3d 344, 347 (7th Cir. 2000) (noting that the plaintiff wanted the state to accommodate, rather than ignore, his disability), *rev'd on other grounds*, *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 912-13 (7th Cir. 2003).  In the instant case, Brettler was asking Purdue University to accommodate, rather than disregard, his alleged disability.  Although *Walker* is no longer good law after *Lane* insofar as it applies to individual claims for money damages against the States under Title II for claims relating to access to courts, the narrow holding of *Lane* leaves in question the validity of *Walker* as to other claims brought under Title II of the ADA.  *See Lane*, 541 U.S. at 531.

Regardless, the Court's inquiry on immunity under Title II of the ADA stops at this recognition of the current status of the issue in the Seventh Circuit because Purdue University does not assert in its Motion for Summary Judgment that it is immune from suit by Brettler under Title II of the ADA.  Because the Court need not raise Eleventh Amendment immunity *sua sponte* and because the immunity may be waived by the State entirely, *see Wisconsin Department of*

32

*Corrections v. Schacht*, 524 U.S. 381, 394 (1998) (citing *Patsy v. Board of Regents of Florida*, 457 U.S. 496, 515, n. 19 (1982)), the Court declines to decide whether Purdue University is immune from suit for claims of discrimination in higher education under Title II of the ADA.  Therefore, the Court turns to the merits of Brettler's claim.

In his Motion for Summary Judgment, Brettler argues that Purdue University failed to accommodate his disability when it (1) did not act on his request of Lou Ann Baugh–the Program Coordinator,[11] his professors, and Ms. Thompson for space to stand and move around in class so that he could control the effects of his "narcoleptic condition," and (2) did not grant his request to drop a class before the deadline in order for him to be able to dedicate more time to and catch up in his other classes.  Purdue University submits that Brettler is not disabled, did not identify himself as disabled, and made no requests for reasonable accommodation.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The statute defines a "qualified individual with a disability" as one who, "with or without reasonable modifications to rules, policies, or practices . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the public entity."  42 U.S.C. § 12131(2).  In the context of public higher education, "Title II requires state colleges and universities to make

_____

[11] In his Motion for Summary Judgment, Brettler identifies Lou Ann Baugh as the person to whom he made the request that he be allowed to stand in class.  *See* Pl. Mot., p. 1.  In his Response to Purdue University's Motion for Summary Judgment, Brettler identifies the person only as the "Program Coordinator."  Pl. Resp., ¶¶ 2-3 (Brettler Aff.).

reasonable accommodations for disabled students to ensure that they are able to participate in the educational program." *Constantine*, 411 F.3d at 488; *see also* 42 U.S.C. § 12131(2).

To establish a claim under Title II, Brettler must prove: (1) that he is a qualified individual; (2) with a disability; and (3) that he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was otherwise discriminated against by any such entity; (4) by reason of his disability. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003); *Lazaris v. Springs*, No. 04-C-844-C, 2005 WL 701699, * 3 (W.D. Wis. Mar. 25, 2005) (citing cases); *Dorsey v. City of Detroit*, 157 F. Supp. 2d 729, 731 (E.D. Mich. 2001) (citing *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000)); *Bowers v. National Collegiate Athletic Ass'n*, 118 F. Supp. 2d 494, 511 (D.N.J. 2000); *see also* 42 U.S.C. § 12132.

Under the ADA, "disability" is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," "a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C); *see also* 45 C.F.R. § 84.3(j)(1). Brettler does not submit any evidence demonstrating a record of narcolepsy or that he is regarded as having narcolepsy. *See* 42 U.S.C. § 12102(2)(B),(C). Therefore, the Court is concerned only with the first definition of disability, and Brettler must establish that he is disabled because of a "a physical or mental impairment that substantially limits one or more of [his] major life activities." 42 U.S.C. § 12102(2)(A).

Under this definition, the ADA "requires those claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial." *Toyota Motor Mfr., Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002) (internal quotation marks omitted) (quoting *Albertson's, Inc. v. Kirkingburg*, 527

34

U.S. 555, 567 (1999)).  Courts must determine the existence of a disability under this test on a case-by-case basis.  *Id.* (citing 42 U.S.C. § 12102(2); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999); *Albertson's*, 527 U.S. at 566; *Bragdon v. Abbott*, 524 U.S. 624, 641-642 (1998); 29 C.F.R. § 1630.2(j)).

Under a three-step inquiry to determine disability under § 12102(2)(A), a plaintiff first must prove the existence of a mental or physical impairment.  *Id.* at 194-95.  Second, "[m]erely having an impairment does not make one disabled for purposes of the ADA. [Plaintiffs] also need to demonstrate that the impairment limits a major life activity."  *Id.* at 195.  For the purposes of the ADA, a major life activity is an activity "of central importance to daily life."  *Toyota Motor*, 534 U.S. at 197.  The regulations define "major life activities" as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii).  Finally, a plaintiff must show that the limitation on the major life function is substantial.  *Toyota Motor*, 534 U.S. at 195.  "Substantially limits" means "[u]nable to perform a major life activity that the average person in the general population can perform; or [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  29 C.F.R. § 1630.2(j).  When considering whether an individual is substantially limited in a major life activity, a court considers "[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment."  29 C.F.R. § 1630.2(j)(2)(i)-(iii).

As to the first prong, Brettler has not clearly stated what his impairment even is, much less provided evidence demonstrating such an impairment. The only admissible evidence Brettler offers of an impairment is a statement in his self-serving Affidavit that he has a "narcoleptic condition."[12] Brettler submits no medical records or affidavits establishing any such impairment. *See Reberg v. Road Equip.*, No. 2:04cv368 PS, 2005 WL 3320780, *6, *6 n. 3 (N.D. Ind. Dec. 7, 2005) (discussing the differences between the plaintiff's diagnosis of sleep apnea and periodic leg movements and the plaintiff's claim she was diagnosed with narcolepsy); *Poindexter v. Mill Creek Cmty. Sch. Corp.*, No. IP 98-1242-C M/S, 2000 WL 33309375, *1 (S.D. Ind. Mar. 21, 2000) (setting forth in detail the history and treatment of the plaintiff's narcolepsy). In his unsworn Motion for Summary Judgment, Brettler references his "medical condition," "condition," "disability," and "intellectual disability" without detail or evidentiary support. Brettler has failed to prove that he has a mental or physical impairment.

---

[12] A plaintiff cannot "rely upon conclusory allegations in affidavits" to suffice for his response to a Motion for Summary Judgment. *Fortenberry v. Board of Sch. Trs.*, 149 F. Supp. 2d 542, 547 (N.D. Ind. 2000) (citing *Smith v. Shawnee Library Sys.*, 60 F.3d 317, 320 (7th Cir. 1995)). Any assertions must be supported by factual evidence. *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998). Legal arguments, self-serving statements without factual support in the record, and mere speculation or conjecture are not properly included in an affidavit supporting or opposing summary judgment and should be disregarded by the court. *See, e.g., Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001) (self-serving affidavits); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999) (speculation or conjecture); *Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985) (legal conclusions). A *pro se* litigant's pleadings will be liberally construed, but when they are completely void of an evidentiary-based response to an opposing party's summary judgment motion, the court must find in favor of summary judgment. *Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001).

In this case, Purdue University served Brettler, the *pro se* Plaintiff, with a proper *Timms* notice along with its Motion for Summary Judgment. The *Timms* notice defines summary judgment, explains its effects, and indicates what steps a plaintiff must take to defeat the motion. *See Wicker v. Illinois Dep't of Public Aid*, No. 99-3862, 2000 WL 702248, *2 (7th Cir. May 24, 2000) (citing *Timms v. Frank*, 953 F.2d 281, 285 (7th Cir. 1992); *Lewis v. Faulkner*, 689 F.2d 100, 102 (7th Cir. 1982)). Therefore, Brettler received sufficient notice of his burden in responding to a motion for summary judgment. Although he did submit an Affidavit, the statements therein are insufficient to establish a genuine issue of material fact on the dispositive issues, as set forth in the body of this Order. Brettler has also failed to comply with Local Rule 56.1. *See supra*, note 2.

However, even assuming, for the purpose of this analysis, that Brettler has proven that he suffers from narcolepsy, he has not established that the condition significantly affects a major life activity.  First, Brettler does not explicitly identify what major life activity he claims is impaired. Other courts have held that "staying awake," in and of itself, is not a major life activity.  *See Reberg*, 2005 WL 3320780 at *5 (citing *Katekovich v. Team Rent A Car of Pittsburgh, Inc.*, 36 Fed. Appx. 688 (3rd Cir. 2002); *Green v. Pace Suburban Bus*, No. 02 C 3031, 2004 WL 1574246 (N.D. Ill. July 12, 2004)).  However, if the inability to stay awake affects the ability to perform another life activity, then it may be considered a disability.  *See Katekovich*, 36 Fed. Appx. at 690.  In this case, Brettler explains indirectly through statements in his Motion for Summary Judgment that his ability to learn is affected because he is unable to stay awake during class.  *See* 45 C.F.R. § 84.3(j)(2)(ii) (listing "learning" as a major life activity).  In his Motion for Summary Judgment, Brettler states that he "had established a poor reputation by falling asleep in all of his classes and falling behind academically" and that professors had been complaining that he had been falling asleep in class. Pl. Mot., pp. 1, 4.  However, Brettler alludes to this effect of his condition on his ability to learn only in his unsworn Motion, not in his Affidavit.  Moreover, Brettler does not provide sufficient facts to establish the severity of his sleep disorder or that his sleep disorder impairs his ability to learn. Brettler's unsupported allegations are insufficient to meet his burden on summary judgment.

Finally, under the third prong, Brettler has not proven that his alleged narcolepsy substantially limits his ability to learn.  The burden is on plaintiffs to "prove a disability by offering evidence that the extent of the limitation [caused by their impairment] . . . is substantial." *Toyota*, 534 U.S. at 198 (citing *Albertson's*, 527 U.S. at 567).  Brettler makes no statement in his Affidavit as to the nature and severity of his condition; rather, he describes the impact that his condition

allegedly has on his ability to learn through an ambiguous statement in his Motion: "It took a significant portion of the semester for Mr. Brettler to learn from his specialist physician that his condition could be controlled [by standing in class], a situation which was explained to Ms. Thompson.  Since by then he was already hopelessly behind in his studies, it was unreasonable to deny Mr. Brettler his right to drop a class."  Pl. Mot., p.1-2.  Brettler does not argue that he cannot learn or does not offer evidence or argument on the extent to which his sleep condition affects his ability to learn as compared to how an average person without a sleep condition would be able to learn.  Finally, Brettler offers no evidence that it was his sleep condition or "narcoleptic condition" that caused him to fall behind in his course work, necessitating the extension of time sought from and granted by Dr. Lovejoy.  Brettler has failed to prove that his alleged narcolepsy substantially limits a major life activity.[13]

Even if Brettler had proven that he suffers from a "narcoleptic condition" and had proven the significant limitations that condition posed on his ability to learn, Brettler cannot make out the remainder of his *prima facie* case under Title II of the ADA.  For the purposes of this analysis, the Court will assume that Brettler is a "qualified individual" in that he was accepted into the graduate program by Purdue University and Purdue University does not argue that he was not otherwise qualified to do the academic work.  As for the last two elements–(3) that he was excluded from

---

[13] Other cases have considered whether an individual suffering from narcolepsy qualifies as disabled under the ADA.  In *Hoskins v. Northwestern Memorial Hospital*, the court concluded that a man who had narcolepsy was not disabled.  No. 01 C 1116, 2002 WL 1424562, *6-7 (N.D. Ill. June 28, 2002).  Though he fell asleep at a couple of board meetings and made a general request for a longer lunch break, Hoskins never provided medical records showing that he could not perform his job functions, never made a specific request for a longer lunch break, and admitted that he could still perform the essential duties of his position; therefore, he was not disabled and his failure to accommodate in employment claim failed.  *Id*. at *7.  In *Kolecyck-Yap v. MCI Worldcom, Inc.*, the plaintiffs alleged to have suffered from "sleep disorders;" however, because none of them showed how any major life activity was impaired, the court concluded that they were not disabled.  No. 99 CV 8414, 2001 WL 245531, *9-12 (N.D. Ill. Mar. 12, 2001).

participation in or denied the benefits of the services, programs, or activities of a public entity, or

was otherwise discriminated against by any such entity; (4) by reason of his disability–Brettler has

not demonstrated that Purdue University excluded him from participation in the graduate program

by failing to make reasonable accommodations, denying him his graduate assistantship, or otherwise

discriminating against him *by reason of his disability*. *See Dadian v. Village of Wilmette*, 269 F.3d

831, 838 (7th Cir. 2001) (explaining that a public entity violates Title II of the ADA by failing to

reasonably accommodate a plaintiff's disability or by discriminating against the plaintiff because

of the disability, and either constitutes a violation of the Act) (citing *Washington v. Indiana High

Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 846-48 (7th Cir. 1999)).  The Court will consider each of the

adverse actions alleged to have been taken by Purdue University against Brettler in turn.

      First, Brettler argues that he requested reasonable accommodations that were not granted.

"A public entity must reasonably accommodate a qualified individual with a disability by making

changes in rules, policies, practices or services, when necessary."  *Dadian*, 269 F.3d at 838 (citing

42 U.S.C. § 3604; *Washington*, 181 F.3d at 847-48).  Brettler's initial accommodation request for

roomier seating because he is a larger than average man was communicated to the program

coordinator, who, according to Brettler, "overtly and carefully complied" with the request.  Pl.

Resp., p. 1 (Brettler Aff.).  After being directly asked, the program coordinator stated that she was

the appropriate contact for such requests.  A few weeks into the semester, Brettler realized that he

could control his "narcoleptic condition" by standing up during class, and he informed the program

coordinator of his need for space to stand and move around during class.  *Id*.  Brettler states that

"[n]o accommodation was made" as to this request.  *Id*.  In response, Purdue University argues that

it was not aware of Brettler's alleged disability, as demonstrated by the Affidavit of Heather A.

Stout, the Assistant Dean of Students, who testifies that Brettler never made a request of Adaptive Services for assistance on the basis of disability nor did he identify himself as an individual with a disability to Adaptive Services.

Upon admission to the graduate program at Purdue University, students receive a Personal Information Sheet, sent with the admissions letter, that sets forth the services available for students with disabilities and the process for obtaining auxiliary aids. The Personal Information Sheet directs students to contact Adaptive Services, Office of the Dean of Students, in Schleman Hall to arrange any necessary accommodations. Brettler did not seek accommodation through the channels specifically put in place by Purdue University to address his needs.[14] Brettler also does not dispute that he received the Personal Information Sheet or that Adaptive Services is whom he should have contacted to pursue his desired accommodations. Purdue University did not make the physical classroom accommodation because it was not aware of Brettler's disability or the need for the accommodation. Nor does this alleged failure to accommodate his request constitute intentional discrimination based on disability as Brettler has not demonstrated that the failure of the coordinator to make the accommodation was intentional based on his disability; it is equally plausible that the coordinator simply failed to follow through with the request.

Brettler's second requested accommodation was permission to drop a class so that his credit load would be reduced to nine credits from twelve. At Purdue University, graduate assistants are expected to enroll in twelve credit hours of work a semester and maintain a grade point average of

---

[14] In addition, Brettler refused to work with Chad Martinez, the Assistant Director for Conflict Resolution in the Affirmative Action Office, regarding his allegations of discrimination because he believed Martinez would only work to protect the university. Brettler also declined to meet with Martinez because the possible resolution Martinez had to offer–reinstatement–was unsatisfactory to Brettler who had already "had to make other living arrangements." Pl. Resp., ¶4 (Brettler Aff.).

40

3.0 or higher. Brettler reasons that he would have been able to improve his grades in his remaining nine credits if he had been permitted to drop one of his classes, and he alleges that Dr. Thompson "against University rules, refused to let [him] drop any classes." Pl. Resp., p. 2 (Brettler Aff.). Brettler never sets forth the date on which he requested to reduce his credits nor explains that it would have been possible at that point in the semester to drop a class, even as a reasonable accommodation for an established disability. In addition, Dr. Lovejoy agreed to arrangements for Brettler to submit his assistantship work of two reports late by turning them in one month after the end of the semester. These accommodations were noted in his evaluation form. Nevertheless, at the time of Purdue University's Motion for Summary Judgment, Brettler had not provided Dr. Lovejoy with any work product. Brettler does not explain why this accommodation of an extension of time in one course, rather than being allowed to reduce his total credits, was insufficient to accommodate his disability and allow him adequate time to complete the work in nine credit hours during the semester and the remaining class in the month after the official conclusion of the semester.

Generally, a court does not question a university's expectations about the workload required of a graduate student. *See Czubaj v. Ball State Univ.*, 107 Fed. Appx. 664, 666 (7th Cir. 2004) (citing *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997)). However, such expectations may be suspect as to certain students if the evidence demonstrates that the university refused to make reasonable accommodations in light of a disability. *See id*. In Brettler's case, he has not established that Purdue University knew about his disability or refused to allow him to drop a class because of his disability. Although Brettler testifies in his Affidavit that Dr. Lovejoy made arrangements for Brettler to submit work late, Brettler never associates that accommodation with

41

his disability or states that Professor Lovejoy was aware of the alleged disability.  Nor did Brettler take advantage of the reasonable accommodation–the extension of time–agreed to by Dr. Lovejoy. Finally, as stated above, Brettler did not identify himself as a person with a disability to Adaptive Services.  Notably, Chad Martinez, the Assistant Director for Conflict Resolution in the Affirmative Action Office, offered a possible solution of "reinstatement," which Brettler declined as unsatisfactory as Brettler "had to make other living arrangements."  Pl. Resp., p. 1 (Brettler Aff.).

Next, Purdue University terminated Brettler's assistantship at the end of the Spring 2004 term.  Brettler was notified that he was losing his assistantship in a meeting with Dr. Thompson, and, in a May 14, 2004 letter, Dr. Thompson stated that the assistantship was terminated as of May 7, 2004.  The university policy provides that, if a graduate assistant's grade point average falls below 3.0, the student is automatically put on probation and "performance below this level will result in automatic review and possible loss of assistantship."  Def. Br., Exh. 1, ¶ 9, Exh. 1-B.  Also, "[i]f the Department's periodic review indicates that the assistantship work of the student is unsatisfactory," the assistantship may be "terminated."  Def. Br., Exh. 1, ¶ 10, Exh. 1-B.  According to Dr. Thompson, it is the standard policy for the Department to terminate a graduate assistantship if the student fails to make satisfactory academic progress, as indicated by a minimum 3.0 grade point average.  At the end of the Spring 2004 semester, Brettler had a grade point average of 2.33, which resulted in the termination of his assistantship pursuant to university policy.

Brettler alleges that the evaluation report incorrectly reflected his status because it failed to mention his extended deadline.  This statement is inaccurate as the evaluation form filled out by Dr. Lovejoy states in the comment section: "Mr. Brettler indicated that he would make up work this summer: However, little evidence of any progress thus far."  Def. Mot., Exh. 1-C (Thompson Dec.).

As Purdue University stated in its letter and policies, and as evidenced through its actions with other graduate assistants, an inferior grade point average provides sufficient reason to terminate a graduate assistantship. Brettler might argue that his grade point average fell below 3.0, leading to the termination of his assistantship pursuant to the university policy, only because the university failed to make the requested reasonable accommodations, which, according to Brettler, would have permitted him to catch up in his other classes and raise his grade point average. However, as set forth above, Purdue University cannot be faulted for the alleged failure to accommodate, even if Brettler could establish on summary judgment that he is disabled within the meaning of the ADA, because Brettler did not make the university aware of his disability. Again, Brettler has not explained why the accommodation made by Dr. Lovejoy of an extension of time was not the effective equivalent of a reduced credit load and was insufficient.

Finally, Brettler alleges that Purdue University not only terminated his assistantship but also terminated him from the program. However, Brettler offers no evidence that he was terminated from the program other than through the assertion in his Affidavit that Dr. Thompson verbally terminated him from the program during a meeting with Dr. Thompson and Professor Preckel. To the contrary, the evidence of record–the May 14, 2004 follow-up letter from Dr. Thompson–demonstrates that, because of his 2.33 grade point average, Brettler was placed on academic probation. This action is consistent with the university policy that any graduate assistant whose grade point average falls below 3.0 is automatically put on probation. Brettler offers no documentation or testimony subsequent to May 14, 2004, demonstrating that he was terminated from the program because of his academic performance during the Spring 2004 semester. The evidence of record does not establish that Brettler was terminated from the graduate program.

43

Accordingly, the Court finds that Brettler cannot establish a *prima facie* case under Title II of the ADA.  Brettler has not shown that he is disabled as he has not established his disability, the effect of any disability on a major life activity, or that the effect of a disability on a major life activity is substantial. In addition, Brettler has not shown that Purdue University either failed to make reasonable accommodations or discriminated against him because of a disability.  Therefore, summary judgment on Brettler's education claim under Title II of the ADA is granted in favor of Purdue University.

**CONCLUSION**

Based on the foregoing, the Court **GRANTS** the Defendant's Motion for Summary Judgment [DE 12] and **DENIES** the Plaintiff's Motion for Summary Judgment [DE 17].  Judgment is hereby **ENTERED** in favor of Purdue University and against David Brettler.

All pre-trial and trial settings are **VACATED**.

SO ORDERED this 10th day of January, 2006.


 s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:    All counsel of record
       *Pro se* Plaintiff

44